OPINION OF THE COURT
Judith Sheindlin, J.
Gregory was born in 1979, Kareem in 1980. They were placed in foster care by their mother in 1981.
They continue to live and thrive in their original foster home and their foster parents wish to adopt them.
The placement agency initiated the instant proceedings to terminate the parental rights of the natural parents and free the children for adoption.
The respondent mother evinced an intent to forego her parental responsibility to these two children in two respects: her visits with them, despite agency efforts, became sporadic— she arrived late or not at all for planned visits with the children approximately 40% of the time; she initially held herself out as a discharge resource, but later substituted her mother, and then in 1983 the paternal grandmother, as a resource for the children. Her whereabouts were often unknown to the agency. As a parent her paramount interests should have been the return of the children to her custody and planning a home for them.
Children do not wait in a state of limbo while their parents mature. Children get older, develop bonds, require nurturing, care and love. Respondent mother offered her children none of these ingredients, not even the continuity of maintaining regular and consistent visits. She made time to enjoy relationships with new men, to travel to other jurisdictions to maintain those, relationships, and to have another child while these children waited for her. The facts adduced at this trial clearly demonstrate that she became a nonparent to these two children despite the diligent efforts of the agency to assist her maintain that precious relationship.
She has permanently neglected these boys.
The respondent putative father (hereinafter referred to as the father)[1] has been incarcerated since 1980 serving a sentence of 10 to 20 years. He does not become eligible to be *326 considered for parole until mid-1990 when the boys will be 10 and 11 years old. Should he serve his entire term, the children will be 20 and 21 years of age when he is released.
Prior to 1984, a convicted felon’s consent to his or her child’s adoption was not required under Domestic Relations Law § 111. By statute effective January 1984, the Legislature repealed this exception for parents "deprived of civil rights”, and their consent to their child’s adoption is now required under the Domestic Relations Law. However, in a proper case, the parental rights of an incarcerated parent may be terminated. By statute effective January 1984, the Legislature correspondingly amended Social Services Law § 384-b to provide that permanent neglect proceedings may lie against incarcerated parents. Social Services Law § 384-b, as amended, attempts to strike a balance between the parental rights of incarcerated parents, consistent with their position, and their parental obligations as defined by statute.
Since 1983 the placement agency has arranged numerous visits with respondent father who had visitation with the boys at prison.
Respondent father’s initial plan for the children was a discharge to, and then adoption by, his mother. In 1985, at a foster care review proceeding, Judge Sheldon Rand, a Judge of this court, found, after a hearing, that discharge to the paternal grandmother was not a viable or realistic plan and not in the children’s best interests. Respondent father was advised of that decision. The decision of Judge Rand is supported by evidence adduced at this trial. The paternal grandmother, while well intentioned, was ambivalent regarding assuming permanent responsibility for the boys. Her own testimony indicates that in 1984 and 1985 she was not ready to assume care of the children until she had saved enough money, which she said would take about a year. She was raising three other grandchildren, was suffering from pains in her legs and back, and, despite both her representation by counsel and agency encouragement to appeal, did not pursue legal recourse from the 1985 determination. While she had a sense of obligation to her son, she tacitly recognized her own physical and emotional limitations as regards the full-time care of these two special needs children.[2]
After respondent father was advised of the 1985 ruling, the *327 only other plan he offered for his children involved him after he would be released from prison and after he would get his life in order. During this period he intended to live with his aunt while the children were to continue residing with the paternal grandmother. The minority of the children may be history when and if those eventualities become realities.
The term of imprisoned parents must be a factor in evaluating the viability of their plan for the future of their children. In this case, Gregory and Kareem may well be adults when their father is released. While incarcerated parents enjoy certain rights, their children, who are guilty of no wrongdoing, must have the superior rights to a chance to be nurtured and grow into productive adults.
The plans that respondent father offered for his children were neither viable nor realistic. To meet these standards, the plan must be meaningful and must consider the needs and welfare of the children. This requires a case-by-case evaluation. Children are unique, parental situations are unique, and for a plan to be a viable one, all circumstances must be considered and weighed.
The act of becoming a parent takes only seconds, but being a parent takes dedication, hard work and sacrifice.
The lack of parenting in any realistic sense, consistent with the relative positions of each respondent, despite the agency’s efforts to nurture all available familial resources, mandates this court to find that both respondents have permanently neglected their children.
This matter is adjourned for a dispositional hearing on April 20, 1987.

. Respondent father, who was never married to the respondent mother, signed an acknowledgment of paternity in 1983, while incarcerated.

. There was some evidence that one of the boys suffers from asthma and the other is mentally retarded.